# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF POSTAL SUPERVISORS<br>1727 King Street, Suite 400<br>Alexandria, Virginia 22314,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE<br>475 L'Enfant Plaza, SW<br>Washington, DC 20260,<br><br>    Defendant. | \*<br>\*<br>\*<br>\*       Case No. 1:19-cv-2236<br>\*<br>\*<br>\* |

\*     \*     \*     ooo0ooo     \*     \*     \*

## COMPLAINT

The National Association of Postal Supervisors ("NAPS") files this complaint against the United States Postal Service ("USPS" or "the Postal Service") for failing to meet statutory requirements regarding compensation for postal supervisors, managers, and other professional and administrative employees who are not covered by collective bargaining agreements, and alleges as follows:

## INTRODUCTION

1.     By failing to adequately compensate its Executive and Administrative Schedule ("EAS") employees – the nearly 50,000 managers, supervisors, and other middle-management employees who are not members of collective bargaining units – the Postal Service violates the Postal Reorganization Act of 1970 ("the Act"), 39 U.S.C. §§ 101, 1003, and 1004, and contributes to the Postal Service's terrible morale problems.  After the Postal Service belatedly announced its "final" pay package for "Field EAS employees" for Fiscal Years 2016-2019 in June 2018, NAPS, pursuant to the Act, sought and obtained review by a three-person fact-finding

panel convened by the Federal Mediation and Conciliation Service, as provided by the Act.  In

April 2019, that fact-finding panel issued a unanimous report and recommendation, finding that

the Postal Service was and is violating the Act by inadequately compensating its EAS employees

in a variety of manners, and that this inadequate compensation contributes to severe morale

problems as well as problems with the attraction and retention of qualified supervisors and

managers.  In May 2019, the Postal Service rejected most of the factfinding panel's substantive

recommendations and issued a new "Final Field EAS Pay Package" that suffers from the same

deficiencies – and violates the Act in the same manners – as the previous "final" pay package.

This lawsuit also challenges the Postal Service's refusal to consult with NAPS regarding

compensation for EAS employees classified by the Postal Service as "Headquarters" or "Area"

EAS employees (subcategories that are not recognized by the Act) and the Postal Service's

refusal to recognize NAPS as the representative of the thousands of postmasters who are

members of NAPS, also in violation of the Act.

## **PARTIES**

2.      Plaintiff National Association of Postal Supervisors is a "recognized

organization[] of supervisory and other managerial personnel" employed by the United States

Postal Service "who are not subject to collective-bargaining agreements."  39 U.S.C. § 1004(b).

NAPS represents approximately 27,000 active and retired USPS managers, supervisors,

postmasters, and other professionals.  NAPS's headquarters is located in Alexandria, Virginia,

and it has almost 280 local branches across all 50 states as well as Guam, Puerto Rico, and the

U.S. Virgin Islands.

3.      Defendant the United States Postal Service is an independent federal agency that

delivers 47 percent of the world's mail to nearly 159 million delivery points.  It has

approximately 625,000 employees and annual revenue exceeding $70 billion.  USPS's

headquarters is located in the District of Columbia.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 39 U.S.C. § 409(a), which states that

"[e]xcept as otherwise provided in this title, the United States district courts shall have original

but not exclusive jurisdiction over all actions brought by or against the Postal Service."  The

Court also has jurisdiction under 28 U.S.C. § 1339, which states that "[t]he district courts shall

have original jurisdiction arising under any Act of Congress relating to the postal service."

5.      Venue is proper under 28 U.S.C. § 1391(e), which provides that a suit against a

federal agency is appropriate where "a defendant resides," "a substantial part of the events or

omissions giving rise to the claim occurred or a substantial part of the property that is the subject

of the action is situated," or the "plaintiff resides."  USPS headquarters is located in the District

of Columbia, the decisions challenged in this case were made at that headquarters, and a

substantial number of NAPS members affected by those decisions work or reside in the District.

## STATEMENT OF FACTS

### A.  Background

6.      Approximately 49,000 of the Postal Service's 625,000 employees are EAS

employees – managers, supervisors, postmasters, and other professionals and administrative

employees who, under the direction of the organization's approximately 500 executives, manage

its approximately 442,000 career and 133,000 non-career employees (carriers, clerks, and others

who are represented by four bargaining units).

7.      EAS employees are distributed among over 1,000 job titles and job levels.

8. The Postal Reorganization Act of 1970 requires the Postal Service to compensate its employees, including its EAS employees, comparably to employees at similar jobs in the private sector. 39 U.S.C. § 1003(a). The Postal Service must ensure that both the "rates and types of compensation" that it pays its officers and employees are comparable to those in the private sector. 39 U.S.C. § 101(c).

9. Under the Act, *id.* § 1004(a), the Postal Service must also:

    a. "provide compensation, working conditions, and career opportunities that will assure the attraction and retention of qualified and capable supervisory and other managerial personnel;"

    b. "provide adequate and reasonable differentials in rates of pay" between carriers and clerks and supervisory and other managerial personnel; and

    c. "establish and maintain continuously a [compensation and promotion] program … that reflects the essential importance of a … well-motivated force to improve the effectiveness of postal operations."

10. As a "recognized organization of supervisory and other managerial personnel who are not subject to collective-bargaining agreements," NAPS is entitled to "participate directly in the planning and development of pay policies and schedules, fringe benefit programs, and other programs relating to supervisory and other managerial employees." *Id.* § 1004(b).

11. The Act sets out a timeline for engagement between USPS and NAPS on pay policies and schedules and fringe benefit programs. *See id.* § 1004(d)-(e).

12. NAPS is entitled to review and make recommendations with respect to any USPS proposed pay policies and schedules and fringe benefit programs, and USPS must give NAPS's recommendations "full and fair consideration." *Id.* § 1004(d)(1).

4

13.     If NAPS believes that any USPS final decision regarding pay policies and schedules and fringe benefit programs does not meet the statutory requirements for EAS compensation, NAPS may request that the Federal Mediation and Conciliation Service ("FMCS") convene a factfinding panel concerning the decision.  *Id.* § 1004(f)(1).

14.     The panel must recommend standards for pay policies and schedules and fringe benefit programs affecting NAPS members, consistent with the policies of the Act.  *Id.* § 1004(f)(3).

15.     Within 15 days of the panel's recommendation, USPS must provide NAPS with its final decision, giving "full and fair consideration to the panel's recommendation."  *Id.* § 1004(f)(5).

**B.  The Postal Service's 2016-2019 EAS Pay Package Decision**

16.     In September 2017, after reaching a retroactive collective bargaining agreement with the National Association of Letter Carriers for the years 2016-2019, the Postal Service sent a proposed "EAS Pay Package Proposal/Fiscal Years 2016-2019/Field EAS Employees" to NAPS.

17.     The package covered six areas regarding EAS pay and benefits: Pay for Performance, Salary Ranges, Health Benefits Contribution, Promotional Pay Increase, Position Upgrade, and Work Groups.

18.     Between September 2017 and June 2018, NAPS and the Postal Service consulted via meetings, letters, and emails regarding the proposed pay package.

19.     The Postal Service rejected most of NAPS's recommendations regarding the EAS Pay Package and issued a "final" decision on June 28, 2018, which it revised slightly on July 20, 2018.

20.     On July 6, 2018, NAPS wrote to the FMCS to request the factfinding process

provided under 39 U.S.C. § 1004(f).

**C. The Postal Service Fails to Compensate EAS Employees Comparably to Similar Jobs in the Private Sector**

21.     The Postal Service's compensation for its supervisors, managers, professionals,

and administrators (i.e., all of its non-postmaster EAS employees) is significantly below

compensation that comparable private sector companies provide for comparable jobs.

22.     The Postal Service has not ensured that EAS compensation matches market

compensation for comparable private sector jobs, nor has it ensured that its compensation keeps

pace with increases in the private sector.

23.     The Postal Service neither conducted nor obtained any surveys or studies

regarding private sector compensation between 2012 and its July 2018 final EAS Pay Package

Decision for Fiscal Years 2016-2019.  In preparation for the factfinding hearing in December

2018, the Postal Service commissioned a study of nationwide salaries for eight of its

approximately 1,000 EAS positions, but that study did not consider the total compensation for

any of those positions, nor did the study look at what the private sector pays in high-wage

locations.  Thus, the Postal Service does not regularly maintain data to ensure that its EAS

compensation is comparable to compensation for similar jobs in the private sector.

24.     Unlike the rest of the federal government and all employers with nationally

dispersed worksites, the Postal Service does not provide for locality pay.  Thus, in high-wage

areas such as New York, San Francisco, and Washington, D.C., the Postal Service's

compensation is more than 20% below what private companies pay for comparable jobs.

25.     It is also standard practice in the private sector to provide for annual or biennial

reviews of market compensation and make adjustments to salary levels as needed to remain

competitive.  But EAS employees receive no pay increase tied to increases in market rates of pay or inflation due to USPS policy.

26.     Instead, all EAS pay increases (other than by promotion or as a result of the Supervisory Differential Adjustment, discussed below) are determined by the Postal Service's Pay for Performance ("PFP") system.  As found by the factfinding panel "the PFP system, as constructed and implemented by the Service, does not satisfy the statutory criteria of comparability and the maintenance of a well-motivated workforce."

27.     In many years, all or a substantial number of EAS employees (even employees who perform well) receive no pay increase or minimal pay increases, even when market rates increase substantially.  In 2012 and 2013, no EAS employee received a pay increase, and in 2014, they all received only a 1% pay increase.  In 2015, the average increase was less than 2%. In 2016, the average increase was only 1.3%, and over 11,500 EAS employees (over 38% of non-postmasters) received no pay increase.  In 2017, the average increase was 2.6%.  In 2018, the average pay increase was only 1.3%, and over 5,000 EAS employees (16%) did not receive any pay increase.

28.     In 2019 (based on the FY2018 PFP), the average increase for EAS salaries was again under 2%.  In 2019, 18.5% of EAS employees received a 2.5% raise, 38.2% received a 2.0% raise, and 38.5% (over 16,500 EAS employees) received no pay increase at all.  Less than 5% of EAS employees received a raise greater than 2.5%.

29.     According to the Postal Service, in the nine years from FY 2009 to FY 2018, the average Field EAS salary increased by a *total* of 6%.

30.     These increases contrast with comparable private sector employees, whose average and median salaries have increased by approximately 3% *annually* for the last several years.

31.     These salary gains in the private sector do not reflect total compensation, since typical private-sector employees also earn bonuses of seven-to-ten percent of their salary, which EAS employees do not receive.

32.     The meager or non-existent EAS pay increases also contrast with the members of USPS bargaining units (the employees supervised and managed by the EAS employees), all of whom received annual pay raises in the 2016-2019 contracts negotiated with the Postal Service.

33.     In addition, EAS employees at the top of the salary ranges for their pay grade are eligible only for a lump sum payment rather than an increase in base salary.  Thus for 2018, the approximately 4,000 EAS employees at the top of their pay grade received no pay increase, but at most a lump sum payment if they were in box 4 or higher of the 15-box PFP pay matrix (since boxes 1 through 3 provide for no increase at all).

34.     As a result of these multiple failures of the Postal Service to ensure that EAS employee salaries keep pace with their private-sector peers, the midpoint of salary ranges for EAS employees is almost always below the national average.  After accounting for additional cash compensation widely offered in the private sector (bonuses, stock options, etc.) and for locality pay, EAS total cash compensation lags far behind the private sector.  Thus, EAS compensation is not comparable to the rates and types of compensation paid in the private sector for comparable jobs, in violation of 39 U.S.C. §§ 1003(a) and 101(c).

**D.  The Postal Service Does Not Provide an Adequate Differential Between What It Pays Clerks and Carriers and What It Pays Their Supervisors and Managers**

35.     Despite the statutory requirement for "adequate and reasonable differentials in the rates of pay" between clerks and carriers and the EAS employees who supervise and manage them, thousands of EAS employees supervise tens of thousands of craft employees whose base salary exceeds their supervisor's, despite the fact that supervisors generally work the same or longer hours.  Once overtime is taken into account, tens of thousands more craft employees earn more than their supervisors (on an hourly basis).

36.     The Postal Service uses a Supervisory Differential Adjustment ("SDA") that purports to ensure that EAS employees earn more than the clerks and carriers they supervise but in practice fails to meet that statutory requirement.

37.     Three interrelated problems with the way the Postal Service calculates its SDA result in thousands of EAS employees earning less than the craft workers they supervise: The first problem involves the Postal Service's use of a lower-paid clerk position (rather than a higher-paid and more populous carrier position) as the benchmark for the calculation of the SDA minimum for the "all other" category of EAS positions.  The second problem involves the ability of craft employees to earn overtime at a substantially higher rate than their supervisors, quickly surpassing their supervisors in total cash compensation.  The third problem involves the inadequacy of the 5% differential, which contributes to problems 1 and 2.

38.     For over a decade, the Postal Service has calculated its SDA by grouping all front-line supervisors into four categories (Plant Maintenance, Vehicle Services, Postal Police, and All Other Eligible) and then (until recently) adding 5% to the salary of the most populous craft position supervised by EAS employees in each category.  The fourth category of supervisors, "All Other Eligible" EAS employees, lumps a wide range of EAS positions into one

category, ignoring the fact that some of those positions supervise craft employees who earn

substantially more than the salary for the clerk position that the Postal Service uses to set the

"SDA minimum" for the entire "All Other Eligible" category.  The fact-finding panel found that

this "overly broad approach" to calculating the SDA "has, in many instances, resulted in …

unreasonable and inadequate pay differentials when applied to individual supervisors."

39.     For example, for the 2016-2019 EAS Pay Package, the Postal Service has refused

to calculate the SDA minimum salary for Supervisors of Customer Service based on the salary of

the City Carriers they supervise ($64,413 as of November 2018), despite the fact that there are

105,000 City Carriers, Step O, making it the most populous position and step in the entire Postal

Service.  Instead, it calculates the SDA for Supervisors of Customer Service based on a lower

Clerk salary ($60,737 as of September 2018).  The result is that in FY2019, over 4,100

Supervisors of Customer Service, the vast majority of whom supervise City Carriers, received an

SDA minimum salary of $63,774 (105% of $60,737) that is over $600 less than the $64,413 base

salary for the City Carriers they supervise.

40.     The inadequacy of the SDA is compounded by the fact that clerks and carriers

earn overtime after fewer hours worked than their supervisors and at a higher rate than their

supervisors.  Craft employees are entitled to time-and-a-half pay for overtime after eight hours

(and double-pay after 10 hours), while supervisors are, at most, paid for extra hours at their usual

hourly rate after eight-and-a-half hours.  Many supervisors and managers get no overtime pay at

all.  Many clerks and carriers work substantial overtime, and thus many craft employees (even

those whose base salary is less than their supervisors') earn more than their supervisors who

work the same hours.  This problem of significant numbers of line employees using overtime to

out-earn their supervisors is not a problem in the private sector, as private employers typically

maintain considerably higher pay differentials between front-line supervisors and the workers they supervise (generally 20 to 30% or more) that leaves an adequate differential even if the workers earn substantial overtime.

41.     The larger pay increases that craft employees receive compared to EAS employees contributes to undermining the supervisor differential.  The clerks and carriers whom EAS employees supervise have received, and continue to receive, pay raises (including retroactive raises), cost-of-living increases, and step increases that have narrowed and often eliminated whatever small pay differential previously existed between front-line supervisors and craft employees, especially when craft workers' overtime pay is accounted for.  Thus, USPS's pay rates and schedules for Field EAS employees violates 39 U.S.C. § 1004(a) in this manner, as well.

**E.  The Postal Service Does Not Provide Adequate Compensation to Its EAS Employees Sufficient to Maintain a Well-Motivated Workforce**

42.     The Postal Service's inadequate compensation to its EAS employees contributes to the organization's distressing morale, which in turn affects the agency's success and productivity.

43.     According to the Postal Service's own internal surveys, 75% of its workforce is either "Not Engaged" or "Actively Disengaged."  These results place the Postal Service in the first percentile (the lowest possible) of Gallup's survey of "GrandMean Company-Level Engagement."

44.     The survey data for engagement among Field EAS employees tracks the poor engagement of Postal Service employees overall, with levels of engagement between the 10th and 13th percentile of managers nationwide.

45.     In 2016, NAPS conducted its own survey of member morale that confirmed the poor results from the Gallup survey.

46.     The PFP determines the maximum amount of a pay increase that EAS employees may receive through a complex formula of over 30 metrics and multiple sub-indicators reflecting corporate and unit performance in the previous fiscal year that are largely out of employees' control.  As the factfinding panel found, "[t]he corporate and unit criteria utilized by the Service [to calculate the PFP scores] are so complex and numerous that they are dissociated and attenuated from the work of the EAS supervisors and managers.  As a result, the program fails to effectuate its goals, namely to motivate its supervisors and managers to effectuate the Service's mission."

47.     The Postal Service's EAS pay policies, including for base salary levels and annual adjustments in pay, translate into a poorly motivated workforce, in contravention of the requirements of the Postal Reorganization Act.

**F.  The Postal Service Does Not Provide Adequate Compensation to Its EAS Employees Sufficient to Attract Qualified and Capable Supervisory Personnel**

48.     The Postal Service often has difficulty filling EAS positions with qualified and capable people.  Over one-fifth of EAS grade 17 jobs (the jobs that most frequently directly supervise clerks and carriers) nationwide are not filled within 90 days of being posted.  The actual number of unfilled jobs is likely higher than that, as the Postal Service "manages" that statistic by taking down job postings and then re-posting them.

49.     Qualified craft employees do not wish to apply for supervisory jobs that entail longer hours and greater stress for the same or less pay.

50.     The difficulty recruiting for supervisory positions is particularly acute in high-wage cities.

51.     The Postal Service's EAS pay policies, including those in the EAS Pay Package for Fiscal Years 2016-2019, prevent it from meeting its statutory obligation to attract qualified and capable supervisory personnel.  *See* 39 U.S.C. § 1004(a).

**G. The Postal Service Did Not Allow NAPS to Directly Participate in the Planning and Development of the 2016-2019 EAS Pay Package**

52.     Despite the Postal Reorganization Act's requirement that NAPS "be entitled to participate directly in the planning and development of pay policies and schedules, fringe benefit programs, and other programs relating to supervisory and other managerial employees," 39 U.S.C. § 1004(b), and that the Postal Service give any recommendations from NAPS "full and fair consideration in deciding whether or how to proceed with the program," the Postal Service rejected nearly every recommendation from NAPS in developing and finalizing the 2016-2019 EAS Pay Package proposal, including those recommendations later echoed by the FMCS fact-finding panel.

53.     Further, the Postal Service did not provide NAPS with reasons for its 2016-2019 EAS Pay Package decision, the information on which the decision was based, or the reasons the Postal Service rejected NAPS's recommendations.

54.     The Postal Service simply provided NAPS with its draft and then final decisions, with no explanation or support.

55.     The Postal Service has also failed entirely to consult with NAPS regarding compensation and benefits for "Headquarters" and "Area" employees.

56.     During the 2017-2018 pay talks between USPS and NAPS regarding the Postal Service's FY2016-2019 EAS Pay Package Proposal, the Postal Service distinguished between "Field" EAS employees on the one hand, and "Headquarters" and "Area" EAS employees on the other.

57.     NAPS represents over 7,500 employees located throughout the country whom the Postal Service categorizes as "Headquarters" or "Area" EAS employees, as opposed to "Field" EAS employees.  This includes employees who perform supervisory and managerial responsibilities associated with a range of functions, including vehicle maintenance, shared services, financial, sales, and marketing.

58.     The Postal Service has acknowledged that NAPS represents EAS employees in the sales and vehicle maintenance divisions as well as certain other positions for disciplinary representation purposes, despite those employees being "Headquarters" employees.

59.     The Postal Service has failed entirely to consult with NAPS, let alone allow NAPS's participation, with respect to pay and benefits talks for all Headquarters and Area EAS employees.

60.     The full name of the pay package proposed by the Postal Service for Fiscal Years 2016-2019 was "EAS Pay Package Proposal Fiscal Years 2016-2019 Field EAS Employees." The proposed package applied *only* to the subset of EAS Employees categorized as EAS Field employees, as reflected in the title.

61.      On September 4, 2018, NAPS wrote to the Postal Service to point out that it had never received any proposed pay package for the Headquarters and Area EAS employees it represents.  NAPS also raised the issue in the Pre-Hearing Briefing submitted to the Factfinding Panel.

62.     On December 28, 2018, without any consultation with NAPS (or even any notice to NAPS), the Postal Service issued a document titled, "Area and Headquarters EAS and Pay-Band Pay Package Through Fiscal Year 2019" that purports to be a final pay package for "Area" and "Headquarters" EAS employees.  That document begins with a statement that "this pay

14

package will not apply to those Headquarters and Area positions who are represented by the National Association of Postal Supervisors (NAPS)" and provides a list of the positions that the Postal Service recognizes as represented by NAPS, but reflects the Postal Service's position that it will not recognize NAPS's representation of other Headquarters and Area EAS positions (the majority of such positions).

63.     The Postal Service has provided no explanation for treating EAS "Field" employees differently from "Headquarters" and "Area" employees, or for its failure to consult with NAPS regarding compensation for Headquarters and Area EAS employees.

**H.  The Factfinding Panel's Report and Recommendations**

64.     The Factfinding Panel convened pursuant to 39 U.S.C. § 1004(f) held a two-day factfinding hearing on December 10 and 11, 2018, during which both USPS and NAPS presented evidence through exhibits and witnesses.

65.     Both parties also engaged in post-hearing briefing at the request of the Panel.

66.     The Panel issued its Report and Recommendations on April 30, 2019.

67.     The Panel's findings included the following:

a.  The Postal Service violated its obligations under the Postal Reorganization Act by issuing its July 20, 2018, EAS Pay Package decision without conducting any market survey examining comparable levels of work in the private sector;

b.  The Postal Service's use of an exceedingly broad-based calculus for the SDA and its failure to adequately increase EAS salary maximums has resulted in unreasonable and inadequate pay differentials between EAS supervisors and managers and the craft employees they supervise;

15

c. The SDA, as applied, contributes to the Postal Service's failure to attract qualified and capable supervisory staff;

d. The PFP system, as constructed and implemented by the Postal Service, does not satisfy the Postal Service's statutory obligations regarding comparability and maintenance of a well-motivated workforce; and

e. The proof submitted during the factfinding hearing clearly demonstrated a reasonable basis for establishing locality pay in certain areas of the country. The Postal Service's failure to examine the issue of locality pay prior to issuing its 2016-2019 EAS Pay Package decision contributed to its failure to satisfy its obligations under the Act, and the lack of locality pay may adversely impact employee motivation.

68. The Panel made the following recommendations:

a. All Field EAS employees should receive retroactive raises in base pay and lump sums, including that "each NAPS-represented employee receive, in addition to raises and/or lump sum payments already received, the following retroactive increases in base salary for the following fiscal years, with the caveat that the amount by which any such increase exceeds the maximum of an employee's salary grade will be paid in the form of a lump sum payment: FY2017 – 1.10%; FY2018 – 2.15%";

b. Changes made as part of the July 20, 2018, Pay Package decision should be applied as of that date;

c. The Postal Service should establish a joint work group to address the failure of the SDA to provide adequate and reasonable differentials in rates of pay

between supervisors and managers and their subordinates, including
reviewing how the SDA is calculated and salary range minimums and
maximums;

d.   The PFP system should be included among the issues to be explored and
resolved by a joint work group, because the program as currently designed
and administered is "seriously flawed";

e.   The joint work group, with the assistance of a compensation expert, should
examine the issue of locality pay;

f.   The joint work group should examine the establishment of a permanent Cost
of Living Adjustment for career, non-bargaining unit employees in Field EAS
positions;

g.   The joint work group should engage a mutually-selected mediator and
compensation expert;

h.   The joint work group should issue a report and recommendations on these
issues no later than six months after the Postal Service's final decision on the
matters covered by the factfinding; and

i.   The Postal Service should provide NAPS with written reasons for not
accepting and implementing any recommendations of the joint work group or
the mediator.

**I.      The Postal Service's Response to the Panel's Recommendations**

69.      On May 15, 2019, the Postal Service issued its final decision concerning changes
to pay policies, schedules, and fringe benefits for EAS employees.

70.     The Postal Service rejected most of the findings and recommendations of the Panel.

71.     The final EAS Pay Package Decision through Fiscal Year 2019 for Field EAS Employees maintains the same PFP matrix contained in the Postal Service's July 20, 2018 EAS Pay Package decision.

72.     The Postal Service did not change the way the SDA is calculated, nor did it adjust the differential used from its existing level of 5%.

73.     The Postal Service did not agree to provide any retroactive salary increases, nor did it make any changes in the decision retroactive to July 20, 2018 (the date of its "final" pay package for FY2016-2019).

74.      While the Postal Service agreed to convene a work group to explore resolving issues regarding Field EAS salaries and grades, locality pay, the PFP program, and how salary range minimums and maximums are established, it did not agree to engage a mediator or compensation expert for the work group.

**J.  The Postal Service Has Refused to Recognize NAPS's Right to Represent Postmasters**

75.     NAPS's membership includes over 4,100 postmasters.

76.     Other than the United Postmasters and Managers of America ("UPMA"), NAPS represents the highest share of postmasters in the country.

77.     The majority of postmasters (including almost all of the approximately 8,400 Level 18 postmasters) have no supervisors who report to them.

78.     On October 1, 2018, NAPS wrote to the Postal Service requesting that the Postal Service recognize NAPS's right to represent postmasters.

79.     The Postal Service did not respond until February 25, 2019, when it wrote that "the Postal Service cannot lawfully recognize NAPS as a representative of postmasters in addition to supervisors."

## COUNT I
### Failure to Pay Comparably to the Private Sector
### in violation of 39 U.S.C. § 1003(a) and 39 U.S.C. § 101(c)

80.     Plaintiff incorporates the allegations in the preceding paragraphs.

81.      The Postal Reorganization Act, 39 U.S.C. § 1003(a), requires the Postal Service to "maintain compensation and benefits for all officers and employees on a standard of comparability to the compensation and benefits paid for comparable levels of work in the private sector of the economy."

82.     Section 101(c) of that statute requires that the Postal Service "achieve and maintain compensation for its officers and employees comparable to the rates and types of compensation paid in the private sector."

83.     The Postal Service has failed to conduct or obtain any studies to evaluate the comparability of EAS employees' compensation with compensation in the private sector for comparable work.

84.     The Postal Service has also failed to appropriately adjust minimum and maximum salary ranges to ensure that EAS employees' salary ranges keep pace with the market.

85.     Unlike the private sector, the Postal Service does not provide any annual salary adjustments for its EAS employees.

86.     Unlike the private sector, the Postal Service has refused to implement locality pay adjustments to account for the compensation paid for comparable private-sector jobs in high-wage areas.

87.     As a result, the compensation of EAS employees in the Postal Service lags behind that of employees who do comparable work in the private sector, in violation of the statute.

## COUNT II
### Failure to Provide for an Adequate Supervisory Differential Adjustment, in violation of 39 U.S.C. § 1004(a)

88.     Plaintiff incorporates the allegations in the preceding paragraphs.

89.     The Postal Reorganization Act, 39 U.S.C. § 1004(a), requires the Postal Service to "provide adequate and reasonable differentials in rates of pay between employees in the clerk and carrier grades in the line work force and supervisory and other managerial personnel."

90.     The Postal Service uses an SDA of only 5%, while comparable employers in the private sector pay their front-line supervisors at least 15 to 20% more than the employees they supervise.

91.     The Postal Service also uses an overly broad method of calculating the SDA, such that many supervisors earn less than the craft employees they supervise, especially after overtime is taken into account.

92.     The Postal Service has thus failed to ensure that there are "adequate and reasonable differentials in rates of pay" between EAS employees and the clerk and carrier employees they supervise.

## COUNT III
### Failure to Provide Compensation Sufficient to Attract and Retain Qualified and Capable Supervisory and Managerial Personnel, and Failure to Establish and Maintain a Compensation Program Adequate to Maintain a Well-Motivated Workforce, in violation of 39 U.S.C. § 1004(a)

93.     Plaintiff incorporates the allegations in the preceding paragraphs.

94.     The Postal Reorganization Act, 39 U.S.C. § 1004(a), requires the Postal Service to "provide compensation . . . that will assure the attraction and retention of qualified and capable supervisory and other managerial personnel."

95.     39 U.S.C. § 1004(a) also requires that the Postal Service "establish and maintain…a [compensation] program…that reflects the essential importance of a…well-motivated workforce."

96.     As a result of the Postal Service's inadequate pay policies and schedules, experienced line employees are generally unwilling to apply to be supervisors.

97.     As a result of the Postal Service's inadequate pay policies and schedules, the Postal Service has trouble attracting qualified and capable supervisory and managerial personnel.

98.     As a result of the Postal Service's inadequate pay policies and schedules, the Postal Service has not and cannot maintain a well-motivated workforce.  The Postal Service has commissioned its own studies that demonstrate abysmal employee engagement among its managers and supervisors, as well as its front-line workers, but has not changed its pay policies and schedules to address the problem.  Also as described above, NAPS has surveyed its own members and similarly found abysmal morale among EAS employees.

99.     Thus, the Postal Service has violated its obligation to "provide compensation . . . that will assure the attraction and retention of qualified and capable supervisory and other managerial personnel" as well as its obligation to "establish and maintain…a [compensation] program…that reflects the essential importance of a…well-motivated workforce."

**COUNT IV**
**Failure to Consult with NAPS Regarding Compensation and Benefits for**
**"Headquarters" and "Area" Employees,**
**in violation of 39 U.S.C. § 1004(b)**

100.    Plaintiff incorporates the allegations in the preceding paragraphs.

101.    The Postal Reorganization Act does not distinguish between Field EAS employees and Headquarters or Area EAS employees.

102.    All EAS employees – whether they are categorized as Field, Headquarters, or Area EAS – qualify as "supervisory and other managerial personnel who are not subject to collective bargaining agreements," and so are represented by NAPS.  39 U.S.C. § 1004(b).

103.    As NAPS is the representative of all EAS employees (other than the portion of postmasters who are represented by UPMA), the Act requires the Postal Service to consult with NAPS in formulating new policies and procedures relating to all EAS employees, including those whom the Postal Service denominates as "Headquarters" or "Area."

104.    The Postal Service has failed entirely to consult with NAPS with respect to Headquarters and Area EAS employees.

105.    Among other shortcomings, the Postal Service did not provide NAPS with advance notice of its proposed decision-making regarding pay policies for Headquarters and Area EAS employees, sufficient reasons underlying its proposal, or an opportunity to make recommendations on the proposals.

106.    Accordingly, the Postal Service has violated its obligation under 39 U.S.C. § 1004(b) to permit NAPS to "participate directly in the planning and development of pay policies and schedules, fringe benefit programs, and other programs relating to" Headquarters and Area EAS employees.

### COUNT V
### Refusal to Recognize NAPS's Representation of Postmasters, in violation of 39 U.S.C. § 1004(b)

107.    Plaintiff incorporates the allegations in the preceding paragraphs.

108.    39 U.S.C. § 1004(b) provides three distinct options for eligibility for consultation under the statute: (1) a supervisory organization that represents a majority of supervisors; (2) an organization other than those representing supervisors that represents at least 20% of postmasters; or (3) a managerial organization (other than an organization representing supervisors or postmasters) that represents a substantial percentage of managerial employees. This language is in the disjunctive.

109.    NAPS qualifies under the first avenue – it is a supervisory organization that represents a majority of supervisors.

110.    By the statute's terms, once an organization qualifies under any of those three options, such "organization or organizations shall be entitled to participate directly in the planning and development of pay policies and schedules, fringe benefit programs, and other programs relating to *supervisory and other managerial employees*." 39 U.S.C. § 1004(b) (emphasis added). The statute confers consultation and participation rights to a qualifying *organization* – not a limited subset of its members. Those rights include the right to consult on behalf of all its "supervisory and other managerial employees."

111.    Postmasters are a subset of "supervisory and other managerial employees" (as that term is used in § 1004(b)) and thus are within the scope of employees represented by NAPS.

112.    The title of § 1004 also employs the broad "supervisory and other managerial" formulation. By not separately delineating postmasters, the statute conveys that postmasters are encompassed within that title.

113.    Because NAPS is a qualifying organization, it is entitled to consult on behalf of the over-4,100 postmasters it represents, including by "participat[ing] directly in the planning

and development of pay policies and schedules, fringe benefit programs, and other programs relating to" those postmasters.

114.    The Postal Service has violated 39 U.S.C. § 1004(b) by refusing to recognize NAPS's right to represent postmasters in pay and benefit consultations and other programs relating to postmasters.

115.    The Postal Service has also deprived the over-4,100 postmasters who have joined NAPS of their chosen representation in pay and benefit consultations.

## PRAYER FOR RELIEF

116.    WHEREFORE, Plaintiff National Association of Postal Supervisors prays that this Court grant judgment in its favor and against Defendant United States Postal Service as follows:

A.    Declare, pursuant to 28 U.S.C. § 2201, that the United States Postal Service has violated and continues to violate the Postal Reorganization Act, 39 U.S.C. §§ 101(c), 1003(a), and 1004(a) and (b), by

i.    Failing to achieve and maintain compensation for all EAS employees comparable to the rates and types of compensation paid in the private sector for comparable jobs;

ii.    Failing to maintain compensation and benefits for all EAS employees on a standard of comparability to the compensation and benefits paid for comparable work in the private sector of the economy;

iii.    Failing to provide for an adequate and reasonable differential in rates of pay between employees in the clerk and carrier grades in the line work force and supervisory and other managerial personnel;

24

iv.    Failing to provide compensation sufficient to attract and retain qualified and capable supervisory and managerial personnel;

v.    Failing to provide a compensation system adequate to maintain a well-motivated workforce;

vi.    Refusing to recognize NAPS as the representative of all non-postmaster EAS employees, including all "Headquarters" and "Area" EAS employees; and

vii.    Refusing to recognize NAPS as the representative of all postmasters who are active members of NAPS and refusing to allow NAPS to participate in the planning and development of pay policies and schedules, fringe benefit programs, and other programs relating to postmasters.

B.    Enter an injunction requiring the Postal Service to

i.    retain a neutral compensation expert to conduct a market survey to determine, for each year from FY2016 to the present, (a) the national average salary in the private sector for each EAS position, (b) the national average total compensation (including bonuses) for each EAS position; and (c) locality pay differentials in high-wage areas (i.e., the additional compensation paid by the private sector in and around cities such as New York, San Francisco, and Washington, D.C.) ;

ii.    pay all EAS employees total cash compensation comparable to the total cash compensation paid for comparable positions in the private sector, including retroactive pay to compensate for any and all

difference between the compensation that the Postal Service paid to its EAS employees from October 1, 2015, to the date of final judgment and the total cash compensation paid for comparable positions in the private sector;

iii.    either (a) pay all EAS employees total compensation comparable to the total compensation paid for comparable jobs in the highest-paid location in the country or (b) implement a locality pay adjustment that will assure that EAS employees in high-wage areas are paid comparably to what the private sector pays in that area;

iv.    pay each and every EAS employee eligible for a Supervisor Differential Adjustment a salary with a reasonable and adequate differential above the salary that the Postal Service pays to bargaining-unit employees supervised by the position held by that EAS employee (no less than the 15 to 20% differential that is the low end of the typical private-sector differential), including retroactive pay based on that formula from October 1, 2015, to the present;

v.    recognize NAPS as the representative of all non-postmaster EAS employees, including all "Headquarters" and "Area" EAS employees; and

vi.    recognize NAPS as the representative of all postmasters who are active members of NAPS; and

**C.** Grant Plaintiff such other relief as this Court deems just and proper.

Respectfully submitted,

Andrew D. Freeman (*pro hac vice pending*)
Jean M. Zachariasiewicz
Joseph B. Espo
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
adf@browngold.com
jmz@browngold.com
jbe@browngold.com

Dated: July 26, 2019

*Counsel for Plaintiff National Association of Postal Supervisors*